UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| JASON DEAN GEILS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:11-CV-650-B |
| | § | |
| DON PATIN, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant's Motion for Summary Judgment (doc. 27) in this § 1983

action. Having reviewed the briefing, the record evidence, and applicable authority, the Court

**DENIES** the motion for the reasons that follow.

## I.

## BACKGROUND

This is an excessive force case stemming from events that occurred in connection with

Plaintiff Jason Dean Geils' arrest for driving while intoxicated by Defendant Don Patin, a police

officer for the City of Carrollton, Texas. At the crux of the case is Geils' allegation that Patin used

excessive force against him during the book-in process following his arrest. Specifically, Geils

maintains that Patin, without provocation, shoved him face first into a lock-box on the wall resulting

in serious injuries to Geils' head and legs. For his part, Patin agrees that Geils sustained injuries as

a result of an altercation between the two, but strongly disputes that it was caused by his use of

excessive force. Instead, Patin contends that Geils' injuries were due to Geils' "intoxicated state"

which caused him to lose his balance and fall against the lockbox when Patin attempted to pull him

to a standing position for routine processing.

It is based on his version of events that Patin now moves for summary judgment. Patin argues that the undisputed facts establish, as a matter of law, that his actions did not constitute an unconstitutional use of force and, alternatively, that he is entitled to qualified immunity from suit. The pertinent facts follow.[1]

On the evening of December 10, 2009 at approximately 11:20 pm, Defendant Officer Don Patin, while working as a uniformed patrol officer for the City of Carrollton, Texas observed a vehicle speeding up behind his patrol car in the HOV lane on I-35 in Carrollton. Aff. of Patin ¶ 5. Patin's dash-mounted Stalker RADAR clocked Geils' speed at 83 mph in a 60 mph zone. *Id*. Patin activated his police lights and siren and pursued Geils' vehicle for approximately three minutes until Geils pulled over and stopped in a bank parking lot. Def. Mot. Summ. J. Undisp. Facts ("Def. Facts") ¶ 5.[2]

Patin approached Geils' vehicle and, after some brief inquiries, observed that Geils was exhibiting signs of intoxication and directed Geils to exit his vehicle. Def. Facts ¶¶ 7-9. Geils refused to get out of his car, at which point Patin and another officer physically removed him from the vehicle. Aff. of Patin ¶ 12. Once outside the vehicle, Patin informed Geils that he was being detained for suspicion of driving while intoxicated and tried to enlist Geils' cooperation in completing field sobriety testing.  Def. Facts ¶ 9.  Geils refused to participate in the field sobriety tests, telling Patin he wanted to speak with his attorney. *Id.* Patin then placed Geils under arrest for driving while

---

[1]The facts are derived from the parties' summary judgment briefing and evidentiary submissions. Unless characterized as a contention by one of the parties, these facts are undisputed.

[2] Patin's pursuit of Geils, as well as Geils' interactions with Patin and other officers at the scene, were captured on Patin's dash cam video, which has been submitted by Patin as part of his summary judgment materials.

intoxicated. Aff. of Patin ¶ 13.

Patin transported Geils to the Carrollton City Jail where Patin began Geils' book-in processing.[3] After arriving at the jail, Patin escorted Geils through the jail's entryway and book-in area to an adjacent room where the intoxilyzer machine was located. Once in the intoxilyzer room, Patin recounts that he directed Geils to stand in a square marked out on the floor, read the required statutory warnings about implied consent to a breath or blood sample[4] and then asked Geils to supply a breath or blood specimen. Def. Facts. ¶¶ 13, 14. Geils refused the breath and blood tests. *Id.*

During this interaction, Patin contends–and Geils does not directly dispute in his filings–that Geils repeatedly interrupted Patin by demanding to speak to his attorney and making snide comments. Def. Facts ¶¶ 13, 14. After Geils refused the breath and blood tests, Patin directed Geils to follow him from the intoxilyzer room back to the book-in area where he told Geils to sit in a chair, which he did. Def. Facts ¶ 16. After processing paperwork for a few minutes, Patin walked back over to Geils who was still seated and still wearing his coat. Def. Facts ¶ 17. Patin asked Geils to remove his coat so as to facilitate the book-in process, to which Geils responded "no." *Id.*

What happened next, and why, lies at the heart of this excessive force suit. Geils claims that after he refused Patin's direction to remove his coat and while still seated, Patin grabbed his coat, forcibly pulled him out of his chair and thrust him "with tremendous force" into the wall and counter top. Aff. of Pl. Geils.  Geils further maintains that Patin used such force that his "feet and legs flew

---

[3] Most of the activities during Geils' book-in processing, including his altercation with Patin that Geils alleges involved excessive force, were recorded by a jail surveillance video, which is also part of the summary judgment record.

[4] The statutory warning, referred to as the "DIC 24 Mandated Statutory Warning," requires that law enforcement officials warn those arrested for DWI about the state law's implied consent provision. *See* Tex. Transp. Code Ann. §§ 724.011 and 724.015 (West 2011).

out beneath [him] and [his] lower body was nearly parallel with the floor." *Id.* Geils states that the impact caused "a concussion and a laceration where [his] head hit the metal key lock-box that was attached to the wall." Pl. Br. Supp. Resp. Def. M. Summ. J. ¶ 3. Geils contends that the force applied by Patin caused his thighs to hit the counter in front of the wall resulting in severe bruising on both thighs. Aff. of Pl. Geils. Geils says he was taken by police to Baylor Hospital where he received "several sutures to [his] head and . . . was diagnosed with a concussion." *Id.*

Patin's characterization of the foregoing events, not surprisingly, differs from Geils'. Patin recounts that after Geils refused to remove his coat for a second time, the following series of events occurred:

> I grabbed Geils' left sleeve of the coat (near the shoulder) and pulled him to a standing position. My intent was to place him against the counter to get him to comply with removal of his personal items. In his intoxicated state, Geils did not control his movement. With the momentum that was generated by my pulling him up, he continued past the counter and bent at the waist, hitting his head on the opposite wall and lock box.  I was surprised at this motion because I did not intend for him to bend over and hit the wall.

Aff. of Patin ¶ 20.

Bleeding from his forehead after the impact, Patin recounts that Geils began cursing, at which time he was placed on the ground by other officers in the area and secured in a "padded" cell until a search warrant for his blood could be obtained. Def. Facts ¶¶ 17, 18. Patin states that Geils was later taken by other Carrollton police officers to Baylor Hospital in Carrollton where his blood was drawn pursuant to the warrant and the gash on his head was sutured. Aff. of Patin ¶¶ 22-28.

After the incident, Geils filed a written complaint against Patin with the Carrollton Police Department launching an Internal Affairs investigation. Geils' allegations against Patin were sustained by Carrollton investigators and Patin was found responsible for using "unnecessary

violence" against Geils and causing his injuries. App. Supp. P. Resp. Def. Mot. Summ. J. 9. Patin was placed on indefinite suspension on April 8, 2010 as a result of this incident. Def. Facts ¶ 27. Patin appealed his suspension and was reinstated to full duty on February 9, 2011. Def. Facts ¶ 28. Geils filed this suit against Patin on March 30, 2011. Patin's summary judgment motion is ripe for analysis.

## II.

## LEGAL STANDARD

Summary judgment is appropriate when the pleadings and record evidence show no genuine issue of material fact exists and that the movant is entitled to summary judgment as a matter of law. Fed. R. Civ. P. 56(a); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). Only disputes about material facts preclude a grant of summary judgment, and "the substantive law will identify which facts are material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The movant bears the burden of proving no genuine issue of material fact exists. *Latimer v. Smithkline & French Lab.*, 919 F.2d 301, 303 (5th Cir. 1990). Where the nonmovant bears the burden of proof at trial, the movant need not support its motion with evidence negating the nonmovant's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Instead, the movant may satisfy its burden by pointing to the absence of evidence to support an essential element of the nonmovant's case. *Id*; *Little,* 37 F.3d at 1075.

Once the movant has met its burden, the nonmovant must show that summary judgment is not appropriate. *Little*, 37 F.3d at 1075 (citing *Celotex*, 477 U.S. at 325). "This burden is not satisfied with 'some metaphysical doubt as to material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence." *Id.* (citations omitted). Instead, the nonmoving party must go beyond the mere pleadings and "come forward with 'specific facts showing that there is a

*genuine issue for trial.'"* *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis in original) (quoting Fed R. Civ. P. 56(e)); *see Celotex*, 477 U.S. at 324. The evidence presented by the nonmovant must "support each essential element of its claims on which it will bear the burden of proof at trial." *Munoz v. Orr*, 200 F.3d 291, 302 (5th Cir. 2000). In determining whether a genuine issue exists for trial, the court will view all of the evidence in the light most favorable to the nonmovant. *Id.*

### III.

### ANALYSIS

Patin moves for summary judgment on two grounds. First, he argues that his actions do not rise to the level of an unconstitutional use of force. Second, he maintains that he is entitled to qualified immunity from suit. The Court turns first to the qualified immunity issue.

A.    *Qualified Immunity*

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). When the defendant raises the defense of qualified immunity, the burden shifts to the "plaintiff to demonstrate the inapplicability of the defense." *McClendon* v. *City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002). When assessing the applicability of qualified immunity in the summary judgment context, "the plaintiff can no longer rest

on the pleadings ... and the court looks to the evidence before it (in the light most favorable to the plaintiff) when conducting the *Harlow* inquiry." *Id.* (ellipsis in original)(citations omitted).

The Court undertakes a two-pronged inquiry to evaluate Patin's claim of qualified immunity.[5] The first question is, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled in part by Pearson*, 555 U.S. at 236. The second prong inquires "whether the right was clearly established" at the time of the alleged misconduct. *Id.* The test to determine if the right was clearly established is "whether it would be clear to a reasonable officer that the conduct was unlawful in the situation he confronted." *Id.* at 202. Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

With these standards in mind, the Court turns to the first prong of the qualified immunity inquiry; whether the summary judgment submissions, considered in the light most favorable to Geils, show the violation of a constitutional right. *Saucier*, 533 U.S. at 201. Geils alleges that Patin's conduct violated his Fourth Amendment right to be free of excessive force during his arrest.[6] To establish a claim of excessive force under the Fourth Amendment, Geils must demonstrate: "(1) an injury that (2) resulted directly and only from a use of force that was excessive to the need and that (3) the force used was objectively unreasonable." *Flores v. City of Palacios*, 381 F.3d 391, 396 (5th

---

[5] The Supreme Court in *Pearson*, 555 U.S. at 236 reconsidered the rigid two step qualified immunity inquiry in *Saucier*, allowing District Courts to examine either prong first.

[6] Excessive force cases arising from an arrest or investigatory stop of a "free citizen" are properly brought pursuant to the Fourth Amendment as opposed to the cruel and unusual punishment clause of the Eighth Amendment. *Keim v. City of El Paso*, 162 F.3d 1159-62, 1998 WL 792699, at *4 (5th Cir. 1998) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)).

Cir. 2004);  (internal citations omitted); *see also Ikerd v. Blair*, 101 F.3d 430, 433-34 (5th Cir. 1996). The Fourth Amendment's reasonableness standard governs the analysis and calls on the court to examine whether the officer's actions were "objectively reasonable" in light of the circumstances he confronted, without considering his subjective intent or motive. *Graham v. Connor*, 490 U.S. 386, 397 (1989). The inquiry is "necessarily fact-intensive." *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009) (internal citations omitted). The Court, accordingly, moves to the facts as submitted in the summary judgment record to see if Geils has established the elements of an excessive force claim.

First, whether Geils sustained physical injuries–the laceration to his forehead requiring sutures as well as bruising to his thighs–is not refuted or even directly addressed by Patin in his summary judgment submissions. Aff. of Def. Patin ¶ 20. That so, before moving to the second and third elements, it helps to briefly address the injury requirement because of its interrelatedness to the pivotal question of whether Patin's actions were objectively reasonable under the circumstances. To establish an injury sufficient to sustain an excessive force claim under the Fourth Amendment, some injury must be shown, but a plaintiff need not have sustained a serious or significant injury. *Ikerd*, 101 F.3d at 433-34 n.7.  Instead, the extent of the injury "necessary to satisfy [the] requirement of 'some injury' and establish a constitutional violation is directly related to the amount of force that is constitutionally permissible under the circumstances." *Id.* at 435.[7] That, in turn, depends upon the context in which the injury occurs. *Id.* at 434.  It is also the context in which the events unfolded

---

[7] In a recent Eighth Amendment excessive force case, the Supreme Court reiterated its position that even a *de minimus* injury can serve as the basis for an excessive force claim under the Eighth Amendment. *Wilkins* v. *Gaddy*, 559 U.S. —, 130 S.Ct. 1175, 1178 (2010).  The Court explained that the extent of the injury, while not irrelevant to the excessive force inquiry, instead is only "one factor" to be weighed by the court in deciding "whether the use of force could plausibly have been thought necessary in a particular situation." *Wilkins,* 130 S.Ct. at 1178 (citations omitted).

that informs the Court on the second and third elements of excessive force claims; whether force used in a particular situation is constitutionally sound. It is to that question that the Court now turns.

To determine the constitutionality of force used in any situation, the Court "must determine whether 'the totality of the circumstances justified' the particular use of force." *Ramirez v. Knoulton,* 542 F.3d 124, 128-29 (5th Cir. 2008) (quoting *Tennessee v. Garner,* 471 U.S. 1, 9 (1985)). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham,* 490 U.S. at 396. The relevant factors bearing on reasonableness are "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Graham,* 490 U.S. at 396.  For example, when a police officer is arresting a "dangerous, fleeing suspect," a certain amount of force has been found reasonable. *Ikerd,* 101 F.3d at 434 (citing *Garner,* 471 U.S. at 3 (1985)). In the context of custodial interrogation, however, where the suspect presents "no threat," it has been held that "the use of nearly any amount of force may result in a constitutional violation." *Id.* (quoting *Ware v. Reed,* 709 F.2d 345, 351 (5th Cir. 1983)).

With this in mind, the Court examines the totality of circumstances in which the events at issue occurred in this case. The Court does so by reviewing the parties' summary judgment submissions in the light most favorable to Plaintiff Geils. Here, those submissions, in particular the jail surveillance video, unmistakably demonstrate that Patin's use of force was excessive under the circumstances.

The jail surveillance video, submitted by Patin with his summary judgment materials, lends

significant context to the evening's events and to the Court's ability to view the totality of circumstances surrounding the interactions between the two. The video shows, as Geils and Patin entered the jail, that Geils was not staggering or unsteady, but walking without support at relatively the same speed and cadence as Patin. Def. App. 5 Jail Intake Video. The video also shows that as the two entered, numerous uniformed officers were present in and around the book-in area. In fact, from the time Geils and Patin entered the jail, the video shows three to six uniformed officers moving in and around the area. The book-in area where Geils was seated when Patin pulled him to his feet is shown on the video to be an open area, immediately adjacent to the jail's entrance area. Once Geils is seated, the video shows the uniformed officers, referred to above, conversing and carrying out duties just a few steps away. Patin and the other officers are in full view of each other as Patin completes his paperwork with Geils seated just across from him.

Absent from the video is any indication that Geils–although verbally uncooperative and disrespectful–is physically resisting or physically threatening toward Patin or the other officers at any time leading up to or after the incident. There is, likewise, no indication from the actions of the officers, including Patin, on the video, that they viewed Geils as a physical threat.  In fact, the scene throughout the video, until Patin initiates physical contact with Geils, appears uneventful, one of the officers going about their business. What would otherwise be left to conjecture; whether it was Patin's use of force or Geil's drunkenness to blame for the incident, is substantially put to rest for qualified immunity purposes by the video. The scene, as recorded, shows Patin grabbing Geils' coat, pulling him from his seated position and then in one continuous, accelerated motion, pushing Geils face first against the wall and lock box. Unmistakable from the video is Patin's secure physical hold on Geils and his control over his movement from the moment he pulls him from the chair through

the moment that Geils' face impacts the lockbox. Also clearly visible are Patin's arms pushing against

Geils' back as his face hits the lockbox. So unexpected does this turn of events appear to be to other

officers just steps away, that as  Geils' face connects with the wall, the video shows those officers, who

had been conversing, jerk their heads toward Geils and Patin and rush toward the two. In sum,  the

evening's events, as video-recorded, appear to depict an unprovoked and startling use of force by

Patin against the backdrop of an otherwise business-as-usual custodial setting.

With the foregoing undeniable facts played out on tape, the Court looks to whether or not

the summary judgment record, considered in the aggregate with the video, demonstrates that Geils

has overcome Patin's qualified immunity defense. Understanding that the Court cannot here make

credibility choices, it nonetheless concludes that Patin's version of events, gleaned from his summary

judgment submissions, does not comport with the record evidence. The modicum of support for

Patin's position that Geils suffered from an alcohol-induced lack of body control that caused him to

propel forward as Patin stood him up, seems to be that Geils was legally-intoxicated and belligerent.

That said and accepted, the fact remains that the video does not show Geils staggering or unsteady

on his feet or even needing support as he walked into the jail with Patin. Nor, from the video, does

Geils exhibit a loss of body control in the moments immediately before, during, or after his face hit

the wall. In fact, the velocity at which he is pulled up and pushed by Patin obscures any meaningful

opportunity to assess Geils' body control. This leaves Patin's personal perspective, as an officer on

the scene, as the primary source of his version of events.

Patin argues in his briefing that, because Geils refused to follow "simple commands" during

the evening, including refusing to put his hands on his steering wheel or get out of his car when

directed, and ultimately balking at removing his coat during book-in, that "Patin reasonably believed

that [Geils'] refusal to remove the long coat was leading to further active resistance" by Geils. Def. Br. 8. Yet this contention is contained only in Patin's briefing and is not supported by any of the summary judgment evidence, including Patin's own affidavit. In his affidavit, as mentioned, Patin claims it was Geils' "intoxicated state" combined with the "momentum...generated" when Patin pulled him up that resulted in Geils hitting his head on the wall and lockbox. Aff. of Patin ¶ 20. There is no evidence in the video or any of the other summary judgment evidence that Geils posed any physical threat to Patin or other officers while in custody at the jail.

Certainly, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment" and the inquiry must allow for the often-tense reality in which police officers operate. *Graham*, 490 U.S. at 396-97 (internal quotations omitted). Here, the altercation between the two occurred in the context of a custodial setting after an arrest for driving while intoxicated. Geils, despite his ill-advised verbal belligerence toward Patin, did not attempt to flee or engage in physical contact with Patin at any time. Rudely refusing to remove his coat, while he was seated, did not justify the amount of force used by Patin, substantiated by Geils' injuries and the video. Thus, when viewed in the light most favorable to Geils, Patin's use of force was clearly excessive and clearly unreasonable under the circumstances. Geils has thus satisfied the first prong of the qualified immunity test; he has submitted sufficient evidence in the summary judgment record to make out a violation of his constitutional right to be free from excessive force. *See Freeman v. Gore*, 483 F.3d 404, 410 (5th Cir. 2007) (in deciding qualified immunity on summary judgment, the question is "whether, viewing the summary judgment evidence in the light most favorable to the plaintiff, the defendant violated the plaintiff's constitutional rights.").

As Geils has satisfied the first prong, the Court moves to the second prong of the qualified

immunity analysis; whether Patin's actions were objectively unreasonable in light of clearly established law at the time of Geils' arrest. *Saucier*, 533 U.S. at 201; *Freeman*, 483 F.3d at 411. The clearly established requirement "does not mean that officials' conduct is protected by qualified immunity unless the very action in question has previously been held unlawful." *Cantrell v. City of Murphy*, 666 F.3d 911, 919 (5th Cir. 2012) (internal quotations and citations omitted). In other words, there is no requirement that there be "commanding precedent" labeling the precise conduct complained of unconstitutional, only that its unlawfulness be "readily apparent" from cases addressing "sufficiently similar situations." *Id.* (quoting *Brown v. Miller*, 519 F.3d 231, 236-37 (5th Cir. 2008)). The core concept is that of "fair warning." *Lytle v. Bexar Cnty.*, 560 F.3d 404, 417 (5th Cir. 2009) (internal citations and quotations omitted).

Patin argues briefly and unpersuasively that Geils has failed to demonstrate a clearly established right to be free of the type of force exercised by Patin during the book-in process. Patin's argument hinges on accepting his unsupported factual premise that Geils was "actively resisting" police efforts to "conduct a lawful search of his person and property." Patin's Br. Summ. J. 9. As addressed above, there is nothing in the summary judgment record to support this assertion other than the stipulated fact that Geils verbally refused to remove his coat. For the reasons stated above, Geils' stubborn refusal, in the context it occurred, is insufficient as a matter of law to justify the amount of force employed by Patin. The right to be free from excessive force during an arrest, investigatory stop, or other personal seizure was clearly established in December 2009 when the incident at issue occurred. *Poole v. City of Shreveport*, —F.3d—, 2012 WL 3517357, at *3-4 (5th Cir. 2012) (citing *Graham*, 490 U.S. at 396). Moreover–and more particular to the facts at hand–it is well-settled that "in the context of custodial interrogation, the use of nearly any amount of force may

result in a constitutional violation when the suspect poses no threat to the officers' safety." *United States v. Brugman*, 364 F.3d 613, 618 (5th Cir. 2004) (quoting *Ikerd*, 101 F.3d at 434 (internal quotations omitted)). For these reasons, the Court determines that it was clearly established on the date of the incident at issue that Patin's use of force against Geils was objectively unreasonable under the circumstances and in violation of the Fourth Amendment.

To sum up, viewing the facts in the light most favorable to Geils, he has demonstrated, as a matter of law, the inapplicability of Patin's qualified immunity defense. Patin's motion for summary judgment based on qualified immunity is therefore **DENIED**.

B.      *Excessive Force Claim*

Patin also moves for summary judgment on the merits of Geils' excessive force claim.  Because he has failed to satisfy his burden of establishing that the pleadings and record evidence show that no genuine issue of material fact exists and, therefore, that he is entitled is entitled to summary judgment as a matter of law, Patin's motion for summary judgment on the merits of Geils' excessive force claim is **DENIED**.[8]

## IV.

## CONCLUSION

For the foregoing reasons the Court **DENIES** Defendant's Motion for Summary Judgment.

**SO ORDERED.**

**DATED September 25, 2012**

---

[8] The Court's ruling in Geils' favor on Patin's qualified immunity defense does not preclude a contrary finding by a jury on the ultimate merits of Geils' excessive force claim. *See generally Ibarra v. Harris Cnty.*, 243 F. Appx. 830, 834 n.7 (5th Cir. 2007).

JANE J. BOYLE
UNITED STATES DISTRICT JUDGE